UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

LISA MCMULLEN,

       Plaintiff,

v.                                                                                                   Case No. 1:04-CV-769

RICHARD DUDDLES, II, and                                              HON. GORDON J. QUIST
DUDDLES TREE FARM,

       Defendants.
_____/

## OPINION

In this diversity case, Plaintiff, Lisa McMullen ("McMullen"), has sued Defendant, Richard Duddles II ("Duddles"), for injuries she sustained as a result of an automobile accident. McMullen has also sued Defendant Duddles Tree Farm ("DTF"), Duddles' employer, on a theory of respondeat superior liability. The parties are diverse because McMullen is a resident of Florida and Duddles is a resident of Michigan. In addition, Richard and Linda Duddles, the partners of DTF, reside in Michigan. See Great So. Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 456, 20 S. Ct. 690, 693 (1900).

Now before the Court are DTF's motion for summary judgment regarding the issue of whether Duddles was acting within the scope of his employment with DTF at the time of the accident and Duddles' motion for summary judgment on the issue of whether McMullen can make the required showing under the Michigan No-Fault Act to support a recovery for noneconomic loss. For the reasons set forth below, the Court will grant DTF's motion and deny Duddles' motion.

## I. Facts

On December 4, 2001, McMullen was stopped in her car at a stoplight at the intersection of South State Street and Sanborn Road in Big Rapids, Michigan. As McMullen waited at the light, Duddles approached McMullen's car from behind in his pick-up truck. Duddles failed to stop and struck McMullen's car. McMullen sustained injuries and was transported to a hospital in Big Rapids, where she was treated and diagnosed with a herniated disc.

DTF is a Michigan partnership owned by Duddles' parents, Richard and Linda Duddles. DTF operates a Christmas tree farm in Reed City, Michigan. At the time of the accident, Duddles was an employee of DTF and received a salary of $750 per week. His duties included operating tractors, bull-dozers, and loaders, as well as cutting and transporting trees. Because of the seasonal nature of the work, Duddles' work hours varied, depending upon the time of year. Duddles' employment was on an oral basis. DTF did not have an employee handbook, written employment policies, or records of the hours Duddles spent working for the business. Duddles testified that he did not have a set schedule, but rather, he worked when there was work to do.[1] (R. Duddles Dep. at 23-24.)

In addition to working for DTF, Duddles also operated a Christmas tree lot from the parking lot of a local store in Big Rapids. Duddles operates the business as a sole proprietorship, although his brother occasionally helps him with the business. In 2001, Duddles obtained trees for his business from DTF. Duddles' parents gave the trees to him without charge in order to help him out.

---

[1] Linda Duddles did testify that DTF maintained time cards for Duddles and his brother which contained their names, employee numbers, and an indication that they were salaried employees. (L. Duddles Dep. at 24.) However, she stated that while the cards may have contained information about which crew Richard might have been assigned to on a particular day, it did not contain any information showing specific hours worked. (Id. at 25-26.)

(L. Duddles Dep. at 21.)  Duddles testified that the business is a cash business and that he did not report any of the income from his tree sales as income for 2001.  (R. Duddles Dep. at 21-22.)  DTF does not receive any of the proceeds from Duddles' tree sales. (L. Duddles Dep. at 21-24.) When the accident occurred, Duddles was traveling on his way to his Christmas tree lot.  Duddles was the owner of the truck that he was driving.

At the time of the accident, McMullen had just been laid off from her seasonal job at Elmer's Crane & Dozer, where she had worked full-time for two years, and was on unemployment.  Prior to her employment with Elmer's, McMullen ran a daycare service for approximately nine months. Before the daycare business, McMullen worked at Ferris State University for two years as a cook and custodian.  During the time that she worked at Ferris State University and the time that she ran the daycare business, McMullen also managed a mobile home park.  In February 2002, McMullen moved to Florida with her husband and children to help her parents run a liquor store and to open a restaurant.  McMullen testified that she will help run the restaurant after it opens.  (McMullen Dep. at 30.)

Following her move to Florida, McMullen was treated by a chiropractor.  After that treatment proved unsuccessful, McMullen's family doctor referred her to Dr. Jesse Lipnick, M.D.  McMullen reported lower back pain with pain radiating down to her groin and legs. Dr. Lipnick noted that an MRI scan of her lumbar spine showed "broad-based right paracentral disc protrusion L5-S1 with potential involvement of the right S1 nerve."  Dr. Lipnick recommended a conservative course of treatment. Initially, he prescribed physical therapy and spinal injections.  Dr. Lipnick also prescribed various pain medications and muscle relaxants, including Percocet, Flexeril, and Vioxx.  The injections provided some relief, but by January 2004, McMullen was experiencing intense pain.  In the summer of 2004, Dr. Lipnick treated McMullen with epidural steroid injections and a facet

3

arthrogram at L5, but neither method provided much relief.  In October 2004, McMullen saw Dr. Robert Valentine, Jr., M.D., upon referral from Dr. Lipnick for consultation for S1 joint ablation. Dr. Valentine performed a radiofrequency rhizotomy, which involves cutting the anterior or posterior spinal nerve roots.  The rhizotomy did not help with the pain.  McMullen continued treatment with Dr. Lipnick, who recommended additional joint injections and physical therapy and prescribed pain medication.  In June of 2005, Dr. Lipnick referred McMullen to Dr. John B. Hunt for surgical consultation.  Dr. Hunt treated McMullen with a caudal epidural and bilateral sacral nerve blocks. McMullen continues to experience significant pain and is currently a candidate for disc replacement or spinal fusion surgery.

No physician has placed any restrictions or limitations upon McMullen's employment or other activities because of her back condition, and McMullen admits that she has never requested any restrictions on her employment.  (McMullen Dep. at 13-14, 54-55, 69.)  McMullen states, however, that she does not need employment restrictions because she works for her parents and they make any necessary accommodations.  (Id. at 13-14, 69-70.)  She also claims that the injury has significantly affected various aspects of her life.  She works between five or six hours per week to twenty-five or thirty hours per week, depending upon her pain, whereas prior to the accident she worked full-time.  (Id. at 5, 7.)  McMullen also testified that she no longer can engage in various recreational activities that she enjoyed prior to the accident, such as bike riding, golfing, and bowling.  (Id. at 29, 32-33.)  In addition, the injury affects her ability to sit on the floor and play with her children and has affected her marriage and sex life as well.  (Id. at 29, 36-37.)  McMullen can only stand for ten to fifteen minutes at a time and then must sit down, but she can remain seated for only about twenty to thirty minutes before she must stand up again.  (Id. at 37.)

## II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. Id.

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Agristor Financial Corp. v. Van Sickle, 967 F.2d 233, 236 (6th Cir. 1992) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. Discussion

As mentioned above, DTF and Duddles have filed separate motions for summary judgment, each raising a different issue. In its motion, DTF argues that McMullen cannot present sufficient evidence to show that Duddles was acting within the scope of his employment with DTF at the time of the accident for purposes of respondeat superior liability. Duddles argues in his motion (as to which DTF has joined in) that he is entitled to summary judgment because the undisputed facts show that McMullen is unable to demonstrate an impairment of an important body function that affects her general ability to lead her normal life.

**A.    Respondeat Superior Liability**

The Michigan Supreme Court has described the principle of respondeat superior liability as follows: "'[A] master is responsible for the wrongful acts of his servant committed while performing some duty within the scope of his employment.' *Murphy v. Kuhartz*, 244 Mich. 54, 56, 221 N.W.

5

143 (1928). An employer is not vicariously liable for acts committed by its employees outside the scope of employment, because the employee is not acting for the employer or under the employer's control." Rogers v. J.B. Hunt Transp., Inc., 466 Mich. 645, 651, 649 N.W.2d 23, 26 (2002). "As a general rule, the trier of fact determines whether an employee was acting within the scope of his employment; however, summary disposition is appropriate if it is apparent that the employee was acting to accomplish a purpose of his own." Caron v. Walmart Stores, Inc., No. 254915, 2005 WL 1278480, at *2 (Mich Ct. App. May 31, 2005) (per curiam) (citing Green v. Shell Oil Co., 181 Mich. App. 439, 447, 450 N.W.2d 50, 53 (1989)).

In this case, it is undisputed that Duddles was an employee of DTF. The question is whether he was acting withing the scope of his employment at the time of the accident. DTF contends that it is entitled to summary judgment because the evidence, which is not in dispute, shows that Duddles was acting not for DTF, but for himself at the time of the accident. Specifically, DTF notes that it has presented evidence that: (1) Duddles operated the tree lot as his own business and that DTF had no connection with the tree lot and received no money from the sale of trees by Duddles (R. Duddles Dep. at 17-18, 21-22; L. Duddles Dep. at 22-23); (2) the pick-up truck that Duddles was driving was owned by Duddles, not by DTF (R. Duddles Dep. at 30; L. Duddles Dep. at 30); and (3) Duddles did not work for DTF on the day of the accident (R. Duddles Dep. at 30, 33-34; L. Duddles Dep. at 30; Richard T. Duddles Aff. ¶¶ 2, 3).

McMullen contends that she has presented evidence establishing an issue of fact regarding whether Duddles was acting in the scope of his employment for DTF because: (1) Duddles was a salaried employee of DTF and received a salary on the day of the accident; (2) the accident occurred during normal work hours; (3) Duddles' employment is on an oral basis and DTF does not keep written records of when Duddles was working for DTF or what work he was doing; (4) Duddles first

6

stated that he had filed an assumed name certificate (d/b/a) for the tree lot, but later stated in his deposition that he had not filed a DBA for the business; (5) Duddles did not have or maintain records of any kind regarding the tree lot and he did not report income from sales at the tree lot for 2001 or for any other year; and (6) Duddles originally said that he had purchased the trees for the tree lot from DTF, but admitted at his deposition that DTF provided the trees to him without charge.

     McMullen's evidence fails to show that Duddles was acting in the course of his employment with DTF at the time of the accident. Here, Duddles, as well as Linda and Richard Duddles, stated unequivocally that Duddles was not working for DTF at the time of the accident. McMullen's evidence does not refute this testimony. The fact that DTF paid Duddles a salary merely shows that he was an employee of DTF. Similarly, the fact that the accident occurred during normal business hours says nothing about whether Duddles was carrying out the business of DTF when the accident occurred. No worker, whether hourly or salaried, spends all of his or her time in the business of an employer. As for the remainder of the evidence, i.e., lack of written records and arguable inconsistencies in Duddles' testimony, McMullen merely states that it will create an issue of credibility for the jury sufficient to defeat summary judgment. This argument fails, because "a nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence. Instead, the nonmoving party must present affirmative evidence to defeat a properly supported motion for summary judgment." Cox v. Ky. Dep't of Transp., 53 F.3d 146, 150 (6th Cir. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)); see also Curl v. Int'l Bus. Machs. Corp., 517 F.2d 212, 214 (5th Cir. 1975) ("[T]he party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and . . . the opposing party may not merely recite the incantation,

7

'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof.") (quoting Rinieri v. Scanlon, 254 F. Supp. 469, 474 (S.D.N.Y. 1966)).

In concluding that summary judgment is proper on the issue of respondeat superior liability, the Court is merely determining that, on the evidence presented, McMullen has failed to create an issue of fact for the jury, not that such a claim would not be possible. Theoretically, McMullen could create an issue of fact by showing that: (1) at the time of the accident, Duddles was transporting trees from DTF to his Christmas tree lot; (2) DTF delivered trees to its customers in the course of its business; (3) as part of his employment duties for DTF, Duddles delivered trees to customers; (4) Duddles used his truck (at least on occasion) to deliver trees to customers for DTF; and (5) DTF somehow benefitted from Duddles' delivery of trees to his lot, see Kester v. Mattis, Inc., 44 Mich. App. 22, 24, 204 N.W.2d 741, 742 (1972) (stating that "the rule provides that an employer is liable for the torts of his servant committed while going to or coming from work, if the employee's trip involved a service of benefit to the employer"). Of course, the primary difficulty with this scenario is that McMullen has not put forth such a theory or argument. Beyond this point, there is no evidence that Duddles was hauling trees at the time of the accident. In fact, Duddles testified that he could not remember "for sure" what he did prior to the accident, although he admitted that it was possible that he went to DTF "[i]f we got trees that day." (R. Duddles Dep. at 33.) Such testimony, however, is insufficient to raise an issue of fact. See Baybank v. Vermont Nat'l Bank, 118 F.3d 30, 36 (1st Cir. 1997) (holding that the testimony of an employee of the plaintiff that she could not remember specifically what the defendant had failed to provide and what she had or had not received from the defendant was insufficient to defeat a motion for summary judgment); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) ("Nor may a party rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary

8

judgment."); Universal Reinsurance Co. v. St. Paul Fire & Marine Ins. Co., No. 95 Civ. 8436(WHP), 1999 WL 771357, at *9 (S.D.N.Y. Sept. 29, 1999) ("Mere speculation about what St. Paul may have done is insufficient to raise an issue of fact concerning whether a theft of plaintiffs' trade secrets occurred."). Moreover, there is no evidence that DTF delivered trees to its customers, that delivering trees was part of Duddles' job duties, that Duddles ever used his truck to deliver trees to customers, or, even if all of the foregoing had been established, that DTF benefitted in any way as a result of Duddles delivering trees (that were his) to his own Christmas tree lot.

Finally, McMullen's reliance upon the case of Bajdek v. Toren, 382 Mich. 151, 169 N.W.3d 306 (1969), is misplaced, because in that case, the evidence showed that the employee had been working for his employer immediately before the accident and that the employee was on his way home from his work.[2] See id. at 153, 169 N.W.2d at 307. In addition, the employee had with him equipment and film belonging to his employer, and the employee testified that within an hour after taking pictures, he would have needed to refrigerate the exposed film and to charge part of the equipment. See id. There are no such facts in this case. Moreover, in Bajdek, the Supreme Court, finding that the evidence presented a question of fact, reversed an order of the court of appeals which reversed a jury verdict that the employee was not acting within the scope of his employment. Thus, Bajdek does not help McMullen, and DTF is entitled to summary judgment.

**B.     Serious Impairment Of Body Function**

Duddles argues that he is entitled to summary judgment because McMullen cannot establish a serious impairment of body function as required by the Michigan No-Fault Insurance Act, M.C.L. § 500.3101, et seq. The Act allows an injured party to recover damages for non-economic loss only

---

[2] Both parties incorrectly cite Bajdek as reported at 318 Mich. 151.

9

if she "has suffered death, serious impairment of body function, or permanent serious disfigurement." M.C.L. § 500.3135(1). A serious impairment of body function is "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." M.C.L. § 500.3135(7). This definition consists of three elements: (1) an objectively manifested impairment; (2) of an important body function; and (3) that affects a person's general ability to lead his or her normal life. Kreiner v. Fischer, 256 Mich. App. 680, 684, 671 N.W.2d 95, 97-98 (2003), rev'd on other grounds, 471 Mich. 109, 683 N.W.2d 611 (2004). The issue of whether a person has suffered a serious impairment of body function presents a question of law for the court where there is no factual dispute concerning the nature and extent of the person's injuries or where there is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination of whether the person has suffered a serious impairment of body function. M.C.L. § 500.3135(2)(a). For purposes of the instant motion, we are concerned only with the last element – whether McMullen's impairment affects her general ability to lead her normal life – because Duddles concedes that McMullen sustained an objectively manifested impairment of an important body function (herniated disc). (Def. Duddles' Br. at 10.)

The Michigan Supreme Court addressed at length the issue of when an impairment "affects [a] person's general ability to lead his or her normal life" in Kreiner v. Fischer, 471 Mich. 109, 683 N.W.2d 611 (2004). Applying the plain meaning of the statute, the court stated that the focus must be upon how the "impairment of an important body function . . . affect[s] the *course* of [the person's] entire normal life." Id. at 131, 683 N.W.2d at 625. Elaborating, the court stated:

> Although some aspects of a plaintiff's entire normal life may be interrupted by the impairment, if, despite those impingements, the course or trajectory of the plaintiff's normal life has not been affected, then the plaintiff's "general ability" to lead his normal life has not been affected and he does not meet the "serious impairment of body function" threshold.

10

Id. The court explained the analysis as follows:

> The starting point in analyzing whether an impairment affects a person's "general," i.e., overall, ability to lead his normal life should be identifying how his life has been affected, by how much, and for how long. Specific activities should be examined with an understanding that not all activities have the same significance in a person's overall life. Also, minor changes in how a person performs a specific activity may not change the fact that the person may still "generally" be able to perform that activity.
> . . . .
> . . . . In determining whether the course of the plaintiff's normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life. Once this is identified, the court must engage in an objective analysis regarding whether any difference between the plaintiff's pre- and post-accident lifestyle has actually affected the plaintiff's "general ability" to conduct the course of his life. Merely "*any* effect" on the plaintiff's life is insufficient because a de minimis effect would not, as objectively viewed, affect the plaintiff's "general ability" to lead his life.

Id. at 131, 132-33, 683 N.W.2d at 625, 626. The court identified five objective factors that may be of assistance in determining whether the plaintiff's "general ability" to conduct the course of her normal life has been affected: (a) the nature and extent of the impairment; (b) the type and length of treatment required; (c) the duration of the impairment; (d) the extent of any residual impairment; and (e) the prognosis for eventual recovery. These factors are not exclusive nor are any of them meant to be dispositive by themselves. See id. at 133, 683 N.W.2d at 626.

> For example, that the duration of the impairment is short does not necessarily preclude a finding of a "serious impairment of body function." On the other hand, that the duration of the impairment is long does not necessarily mandate a finding of a "serious impairment of body function." Instead, in order to determine whether one has suffered a "serious impairment of body function," the totality of the circumstances must be considered, and the ultimate question that must be answered is whether the impairment "affects the person's general ability to conduct the course of his or her normal life."

Id. at 134, 683 N.W.2d at 626.

The plaintiff in Kreiner was a self-employed carpenter and construction worker before and after the accident.³ Following the accident, he experienced pain in his lower back, right hip, and right leg, apparently caused by mild nerve irritation to the right fourth lumbar (L4) nerve root in his back and degenerative disc disease with spondylolisthesis. His treatment included cortisone injections, pain and anti-inflammatory medication, physical therapy, and back and muscle strengthening exercises. The plaintiff's pain continued, and approximately two years after the accident his neurologist told him to avoid lifting objects over fifteen pounds and to refrain from excessive bending or twisting. The plaintiff eventually stopped treating with any physician and discontinued pain medication. After the accident, the plaintiff could no longer work eight-hour days and was forced to limit his workday to six hours. He said he could not stand on a ladder longer than twenty minutes at a time, could no longer perform roofing work, and could not lift anything over eighty pounds. In spite of these limitations, the year following the accident was his highest income-earning year ever. In addition, he could no longer walk more than a half mile without resting and could no longer hunt rabbits, although he could hunt deer. The court concluded that the impairment did not affect the plaintiff's overall ability to conduct his normal life because his life after the accident was not significantly different than it was before the accident. It observed that the plaintiff was still able to perform his job as a self-employed carpenter and construction worker, with the possible exception of roofing work, and his injuries did not cause him to miss one day of work. The court concluded:

> Looking at Kreiner's life as a whole, before and after the accident, and the nature and extent of his injuries, we conclude that his impairment did not affect his overall ability to conduct the course of his normal life. While he cannot work to full capacity, he is generally able to lead his normal life. A negative effect on a particular

---

³The court also decided the companion case of Straub v. Collette in the Kreiner decision.

> aspect of an injured person's life is not sufficient in itself to meet the tort threshold, as long as the injured person is still generally able to lead his normal life.

Id. at 137, 683 N.W.2d at 628.

Duddles contends that McMullen's impairment has not affected her general ability to lead her normal life. Duddles notes that McMullen is now helping her parents run their liquor store and will assist them in running the restaurant when it opens and that, although McMullen's work hours vary because of the pain she experiences, she has never asked a doctor for, nor received, any restrictions. In addition, citing the Kreiner court's statement that "[s]elf-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish" that an injury has affected a person's ability to lead her normal life, id. at 133 n.17, 683 N.W.2d at 626 n.17, Duddles notes that any restrictions on McMullen's recreational and sex life are self-imposed and thus cannot establish that her ability to lead her normal life has been affected. Finally, although he concedes that McMullen has experienced some changes, he points out that under Kreiner a negative effect on a particular aspect of a person's life is not sufficient to meet the threshold if the person is still generally able to lead her life, as is the case with McMullen.

Duddles cites four unreported Michigan Court of Appeals decisions in support of his motion, Jacobs v. Provost, No. 246438, 2004 WL 2365074 (Mich. Ct. App. Oct. 21, 2004) (per curiam); Deaton v. Klawon, No. 248136, 2004 WL 2256159 (Mich. Ct. App. Oct. 7, 2004) (per curiam); Keelean v. Mack, No. 262174, 2005 WL 1994160 (Mich. Ct. App. Aug. 18, 2005) (per curiam); and Banwell v. Burstein, No. 251128, 2005 WL 857134 (Mich. Ct. App. Apr. 14, 2005) (per curiam), which held that the plaintiffs failed to show that the impairment affected their general abilities to lead their normal lives.

In <u>Jacobs</u>, the plaintiff experienced pain in her neck, back, and arm, pinched nerves, and migraine headaches. She did not see a doctor, but self-medicated with muscle relaxants. After her supply of medication ran out, she went to the hospital, where she was advised that a C-spine of her neck was negative for fracture. The medical records indicated that the plaintiff's complaints of pain were grossly exaggerated. Before the accident, the plaintiff was employed at a banquet center, where she performed administrative work, tended bar part-time, and assisted wait staff. The plaintiff returned to work a few days after the accident and resumed her normal schedule within a few weeks. She could only perform the administrative work because of her inability to stand on her feet, and there were periods where she could not work her regular schedule or take a day off. Although she was unable to do some activities, such as camping and jet skiing, or lift her grandchildren, she continued to act as the guardian for her grandchildren and continued to travel and garden. The court concluded that although the plaintiff's ability to perform her job was affected, her life after the accident was not significantly different than it was before the accident and she was generally able to lead her normal life.

In <u>Deaton</u>, the plaintiff suffered a herniated disc and ulnar nerve entrapment in her left elbow. She returned to work three and one-half weeks after the accident occurred and was working full-time at the time of her deposition. The only physician-imposed restriction did not preclude her from working. Although the plaintiff refrained from engaging in some recreational activities, the court noted that self-imposed restrictions do not show that an injury has affected a person's general ability to lead her normal life.

The plaintiff in <u>Keelean</u> was a retiree in his early 80's. His pre-existing back problems were exacerbated by the accident. An MRI showed a right paracentral disc herniation. He was treated with a "trigger pain injection" and physical therapy. The court compared the plaintiff's limitations

14

to the plaintiff's limitations in <u>Kreiner</u> and found them to be minor. The court noted that although the plaintiff continued to suffer pain, he could still drive, hunt, and perform some of the limited household chores that he performed prior to the accident, and any restrictions were self imposed. The court observed, "plaintiff continues to be able to do almost everything he once could, although with more difficulty." 2005 WL 1994160, at *2.

In <u>Banwell</u>, the plaintiff sustained a back injury. She claimed that her doctor advised her not to do any pushing or pulling, but the only documented restriction was with regard to snow shoveling. In addition, the plaintiff claimed that she could no longer bowl, golf, take long walks, cut grass, garden, or do home improvements. The plaintiff's doctor had encouraged her to begin lifting early on, and he noted on a previous examination that she did not seem to have any restrictions on her daily life. The court noted that the plaintiff's complaints of sleep deprivation appeared in her medical records and that sleep deprivation apparently had a negative affect on the plaintiff's normal life. The court observed, however, that the plaintiff was still able to work in the position that she held prior to the accident and that she had missed only a total of three weeks of work over the course of three years. In addition, the plaintiff treated herself with hot and cold compresses and over-the-counter medications and had not returned to her doctor for any treatment.

McMullen responds that she meets the threshold because her impairment has affected every aspect of her life. For example, she notes that prior to the accident, she worked full-time, whereas now she works as little as five or six hours in some weeks and at most twenty-five to thirty hours because of the pain. She claims that she and her husband have lost between $20,000 and $30,000 as a result of her reduced work capacity. She also points out that she can no longer engage in her normal recreational activities, such as bike riding, golfing, and bowling; she cannot sit on the floor and play with her children; and her marriage and sex life have changed dramatically. The injury

15

affects the way that she walks and she can only stand for short periods of time and then must sit. Finally, McMullen notes that she continues to suffer great pain and takes narcotic medications, such as Percocet and Morphine, and uses a narcotic patch, fentanyl, on a continuous basis; she is still being treated by doctors; and she faces the possibility of major back surgery. McMullen cites an unreported Michigan Court of Appeals decision, Luther v. Morris, No. 244483, 2005 WL 94795 (Mich. Ct. App. Jan. 18, 2005) (per curiam), for the proposition that a pervasive and debilitating injury, even of short duration, will satisfy the serious impairment of body function threshold. The plaintiff in Luther underwent surgery on her right elbow following an accident and missed about fifty-two days of work. During her recuperation, the plaintiff lived with her sister, who did everything for the plaintiff, because the plaintiff's injured right arm was in a sling and she had limited use of her left hand due to a prior stroke. The court held that although the plaintiff's ability to lead her normal life returned after a few months, the two or three month impairment left the plaintiff virtually unable to do anything for herself and was thus sufficient to meet the threshold. McMullen contends that, as with the plaintiff in Luther, every aspect of her life has been affected, but the difference here is that her impairment has lasted four years, in contrast to the few months in Luther.

      Neither party cites or discusses the recent Michigan Court of Appeals decision in McDanield v. Hemker, __ N.W.2d __, 2005 WL 2372802 (Mich. Ct. App. Sept. 27, 2005) (publication pages not yet available). In that case, in a September 2000 accident, the plaintiff's head and neck were jerked back and sideways in a violent manner when the defendant failed to stop at an intersection and hit the plaintiff's van. The plaintiff's doctor restricted her from working for about six weeks because of pain that she was experiencing in her neck and shoulder. His initial diagnosis was "traumatic cervical myositis." The plaintiff eventually returned to work, but the pain soon returned

16

and she was again restricted from working. An MRI revealed injuries to the cervical spine, which the plaintiff's doctor determined were caused by the accident. The plaintiff's doctor referred her to Dr. Juneja, a pain management specialist. Dr. Juneja diagnosed the plaintiff with chronic neck pain, whiplash syndrome, neck and parascapular myofacial pain, and cervicogenic headaches and treated her with nerve blocks, muscle relaxers, pain medication, and physical therapy. The plaintiff returned to her job of school bus driver and food service person in the fall of 2001. Although the plaintiff initially reported improvement from injections and medications, she returned to Dr. Juneja complaining of increased head, neck and shoulder pain. The plaintiff continued to see Dr. Juneja throughout 2002, 2003, and 2004, and she was continued on pain medication, muscle relaxers, and physical therapy. Dr. Juneja eventually concluded that the plaintiff suffered ligament damage, that the plaintiff's neck pain and headaches were going to be of a permanent nature, and that there was no surgery to correct the ligament damage or realign the vertebrae that were out of alignment. The plaintiff testified that because of the pain, she required assistance from other employees at work; she could no longer engage, or was more limited, in performing certain recreational activities, such as biking, camping, bowling, gardening, and sports; and she could not cook as often. In addition, the plaintiff's husband testified that the plaintiff was moodier and their sex life had decreased. Relying upon Kreiner, the trial court held that the plaintiff did not demonstrate a serious impairment of body function, noting that the plaintiff did not have a residual impairment as a matter of law because her impairment was a self-imposed restriction based upon real or perceived pain. The court of appeals reversed, concluding that the plaintiff's life was altered significantly because of the impairment:

> On review of the entire record, McDanield's injuries resulted in her being out of work approximately six to seven months, needing assistance from coworkers while currently employed because of pain, having to forgo recreational activities once enjoyed, significantly curbing her household chores, limiting her gardening activities, interfering with her sleep habits, decreasing intimacy with her husband, and has [sic]

17

resulted in years of visits to doctors for tests and treatment, which treatment included the use of pain medications, nerve blocks, muscle relaxers, and physical therapy, with a prognosis that she will have to continue such a regimen, in whole or in part, because she will most likely have pain for the remainder of her life. There can be no legitimate or honest dispute that the course or trajectory of McDanield's normal life has been inextricably affected. Comparing McDanield's normal life before and after the accident is similar to comparing day to night; all aspects of her life have been significantly impacted with no meaningful relief in sight.

The court also analyzed the case by applying the five <u>Kreiner</u> factors, but it specifically addressed the footnote in <u>Kreiner</u> related to factor d, "the extent of any residual impairment," which states, "Self-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish this point." The court said that the footnote in <u>Kreiner</u> meant that physician-imposed restrictions based upon real or perceived pain can establish the extent of a residual impairment, but that self-imposed restrictions based upon pain cannot establish the extent of a residual impairment because they are not supported by medical expertise. The court found that, contrary to the trial court's finding, there were physician-imposed restrictions because Dr. Juneja had continued the plaintiff on pain medication and her home exercise program, instructing her to adjust her activities based on her pain level. The court observed:

> [I]n many situations where there are physician-imposed restrictions based on pain, the instructions or limitations provided by the physician will be fairly open-ended, making reference to or being dependent on the level of pain experienced by the injured party when performing a particular task. . . . [I]n cases where there is evidence that the physician has pinpointed a physiological basis for the pain or believes that the patient is truly suffering pain, such evidence, while not conclusive, lends support to a conclusion that instructions by the physician constitute physician-imposed restrictions.

Finally, the court noted that evidence of restrictions is not the only means for establishing the extent of any residual impairment and that restrictions are merely one consideration in determining whether a plaintiff has established a threshold injury.

Considering the evidence in this case, the Court concludes that McMullen has shown that the injury to her back and its residual effects has affected her general ability to lead her normal life under Kreiner. First, the impairment has significantly affected McMullen's work abilities. Although, as Duddles notes, McMullen was laid off at the time of the accident and she voluntarily chose to move to Florida (thus giving up her seasonal employment at Elmer's), McMullen testified that she had two other jobs after she moved to Florida, both of which she quit because of her injury. McMullen stated that she had a clerical position with The Home Exchange working 40 hours a week but was let go because she could not do the job. (McMullen Dep. at 73.) She also had a job with Rinkers, a concrete company, which she held for only three weeks. (Id. at 74.) Moreover, although McMullen is working now, in some weeks she can only work five or six hours, and she testified that she does not need restrictions from her doctor because she is working for her parents. Second, as a result of the injury, McMullen is now unable to engage in many of the recreational activities that she formerly enjoyed and her marital relationship, including her sex life, has been negatively affected. Third, McMullen walks differently because she is stiff and she is unable to stand for more than ten or fifteen minutes at a time. Fourth, McMullen has received various forms of treatment that have provided little or no relief. In his June 13, 2005, office notes, Dr. Hunt states: "The patient has tried a TENS unit which did not help, epidural steroid injection and nerve blocks which did not help (sacroiliac join injections), facet joint injections which did not help and medications which helped some." (6/13/05 Office Notes, attached to Pl.'s Resp. Br.) The extensive treatment that McMullen has received distinguishes this case from Jacobs, Deaton, Keelean, and Banwell, cited by Duddles, and renders it more like McDanield, where the plaintiff received extensive treatment including pain medications, nerve blocks, muscle relaxers, and physical therapy. Fifth, as evidence by the medical records that McMullen has submitted, she is still being treated for pain by doctors on a regular basis,

19

even through the date of her response to Duddles' motion. The records indicate that, except for the possibility of major back surgery, there is no relief in sight and the duration of the impairment has been and will be long term. This fact also renders this case similar to <u>McDanield</u>. Finally, with regard to Duddles' argument that McMullen's restrictions are all self-imposed and therefore do not establish that the injury has affected McMullen's ability to lead her normal life, the Court notes that the circumstances in this case are similar to those in <u>McDanield</u>, where Dr. Juneja indicated that he continued McDanield on her pain medication and home exercise program, with the instruction to adjust her activities based on her pain level. Here, McMullen's medical records show that Dr. Lipnick and Dr. Hunt continued to prescribe pain medication together with physical therapy. And, although not specifically reflected in the medical records, McMullen testified that "[t]he doctors have all . . . stated to do what I can do. If it bothers me, don't do it." (McMullen Dep. at 69.) Thus, as in <u>McDanield</u>, there were physician-imposed restrictions in place based on the pain. In sum, the evidence, as a whole, shows that the impairment has affected McMullen's ability to lead her normal life.

## IV. Conclusion

For the foregoing reasons, the Court will grant DTF's motion for summary judgment and deny Duddles' motion for summary judgment.

An Order consistent with this Opinion will be entered.


Dated:  December 15, 2005                             /s/ Gordon J. Quist
                                                           GORDON J. QUIST
                                            UNITED STATES DISTRICT JUDGE